UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6087-CIV-DIMITROULEAS

WILLIAM M. HICKS,

Magistrate Judge White

    Plaintiff,

v.

DR. W.C. DAVIS, DR. UECKER,
DR. TREVOR WEATHERS, DR. CLINE,
DR. PEARSON, DR. G. PEARSON and
EMSA LIMITED PARTNERSHIP,

    Defendants.

NIGHT BOX
FILED

2 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / F.TL

## DEFENDANTS' OBJECTION TO THE REPORT OF MAGISTRATE JUDGE REGARDING THEIR MOTION FOR SUMMARY JUDGMENT

Defendants DR. W.C. DAVIS, DR. UECKER, DR. TREVOR WEATHERS, DR. CLINE, DR. PEARSON, DR. G. PEARSON and EMSA LIMITED PARTNERSHIP, pursuant to Magistrate Judge Rule 4(b), file this Objection to the Report of the Magistrate Judge Regarding Their Motion for Summary Judgment and Memorandum of Law in Support as follows:

### MEMORANDUM OF LAW

I.    **Background**

    A.    **The Complaint**

William Hicks is a state-incarcerated inmate, sentenced to life without parole by Judge Cohn in Broward County. He is serving his sentence in the Lake Correctional Institution. Although this case has taken an unusual course, including an appeal and partial affirmance of a prior grant of summary judgment, the essential allegations may be summarized.

According to the operative Complaint, Hicks was housed in the Broward County Jail as a pretrial detainee on April 7, 1996[1] when he was attacked by a fellow inmate [Complaint ¶ 8]. Hicks was taken immediately for medical attention, and was treated for his injuries (Complaint ¶¶ 18-24). At that time, Hicks was seen by nursing staff and Defendant Cline, and an x-ray was taken. Cline told Hicks there was no fracture, but, according to Hicks, Cline would not show him the x-ray (Complaint ¶¶ 22-24).

Three days later, Hicks was transferred to another Broward County Jail, and was denied requested medical attention (Complaint ¶ 34). In fact, Hicks claims he was denied medical attention for the remainder of his detention, even though surgery was "suggested" by Defendant Uecker (Complaint ¶¶ 35-42).

**B.  The Medical Records[2]**

The medical records in this case tell a completely different story. Although these extraordinarily voluminous documents have been filed into the record, they will be summarized for convenience.

Hicks entered the jail in August 1995, and most of his early contacts with medical personnel occurred with respect to mental and addiction problems. He was on suicide watch for most of this month. Hicks self-reported a long history of alcohol and crack addiction, and numerous psychiatric interventions for a number of problems. On August 16 and 31, Hicks complained of shoulder pain, which was the result of a 1994 motor vehicle accident. Hicks was seen by medical personnel nearly

---

[1] The date is incorrect. According to records, the altercation occurred on February 9, 1996.

[2] A complete set of Hicks' medical records are identified in and attached to the Affidavit of Barbara Evans, which is attached as Exhibit "A" to the Motion for Summary Judgment.

every day of this month.

On September 22, 1995, Hicks complained of right jaw pain, and was seen by nursing staff. One week later, he was seen by dental staff. His interaction with medical staff in October 1995 regarded only mental health issues, and Hicks voiced no pertinent medical problems.

On November 2, 1995, Hicks had a tooth filled by Defendant Glenn Pearson. On November 6, 1995, he was seen for complaints of head pain from surgery, which apparently occurred prior to his incarceration. Hicks refused at least three appointments with medical staff during this month. Otherwise, Hicks was seen nearly every day regarding various complaints.

Throughout December 1995, Hicks complained of headaches attributed to his psychiatric medications. Again, the records document non-compliance with treatment. Nearly daily interaction with medical staff continued throughout this month.

On January 4, 1996, Hicks was again seen for complaints of head pain. These complaints related to the right eye and temple. Although it was offered that he be moved to the infirmary regarding these complaints, Hicks refused any medical intervention. Nine days later, Hicks complained of the same pain, and inexplicably complained of the medical staff's refusal to treat him. He was once again seen by medical staff, and after conversation, it was determined that his pain was related to the prior motor vehicle accident and stress.

Hicks had complaints of swelling and problems urinating early in February 1999. This complaint was voiced by his mother. Hicks was immediately given a urine test, which was negative. He was seen four times the following day regarding his complaints, and refused to have his blood pressure taken. In a grievance form, Hicks complained about medical staff, and stated his belief that he was dying. The following day, he was seen by Defendant Davis, who reported that Hicks was feeling better except for occasional head and abdominal pain. The same day, Hicks refused nursing

treatment for his problems urinating.

On February 7, Health Services Administrator Richard McDonald wrote Hicks a letter which is included in the medical record in response to Hicks' complaints:

> In less than a week, I have been in contact with 2 of your relatives regarding your care. I personally visit you at cell side and the psych nurse supervisor. I have personally integrated [sic] the psychiatrist, nursing staff, medical doctor, nursing supervisor, to determine if you, in fact, have concerns that we can medically treat. We have collected blood and urine tests. In that time, your current course of care has been interrupted by outside elements who, I am told, encouraged you to refuse the present treatment. For instance, refused to take your (fluid pill, etc.). I firmly believe myself and staff are actively addressing your concerns and will continue to pursue a reason for all of these concerns you may have. Hopefully we may find something concrete to be able to treat.

The same day, Hicks refused medications.

On February 9, 1996, Defendant Davis treated Hicks following the altercation. An x-ray was taken and read by Miguel A. Tome, M.D., which suggested a fracture of the left jaw. Dr. Tome suggested that the x-ray finding be confirmed by examination. Dr. Davis noted a laceration to the right zygomatic arch, which is just below the eye, and the laceration was sutured closed.

The sutures were removed on February 15, after Hicks was transferred to the Broward Main Jail. Dr. Davis ordered additional x-rays, which Dr. Tome read, finding a non-displaced fracture of the right zygomatic arch with no abnormalities of the left jaw. Hicks was prescribed Tylenol III, four times daily for one week, for pain. Two days later, Hicks complained of nausea, but missed his follow up appointment with the physician on February 19. Dr. Davis referred him to the EMSA optometrist, who examined him on February 20, finding his eyesight 20/20 in both eyes. Hicks was prescribed antibiotics, Darvocet was replaced with Tylenol 3, and he was referred to dental for follow up.

On February 21, Hicks was seen by Defendant Weathers, an oral and maxillofacial surgeon.

Dr. Weathers found no swelling, normal eye movement, no deformity of the facial bones, normal pupillary reaction and no double vision. He ordered additional x-rays of the jaw, apparently to confirm or rule out Hicks' complaints. He also ordered Motrin, 600 mg. three times a day for two weeks, a soft diet and a dental follow up. Dr. Tome read the ordered x-rays the same day. Importantly, he found <u>no fracture, dislocation or other bony abnormality of the jaw</u>. The same day, Dr. Davis reviewed the x-rays and Dr. Tome's report. Dr. Davis noted the non-displaced fracture of the right zygomatic arch which was pointed out in the earlier x-ray on February 15, 1996.

Over the course of the next two weeks, Hicks complained of nausea from the Motrin, that he had a broken jaw and required additional pillows, and that three weeks had passed since Dr. Weathers ordered a dental follow up. Each complaint was addressed: he was given extra pillows, Tylenol and Flexeril replaced Motrin, and he was evaluated by Defendant Uecker on March 4.

Because Hicks continued to complain of pain and seek prescription painkillers despite numerous interactions with medical staff, Defendant Cline ordered a repeat facial x-ray on March 15. The x-rays were taken and read by James R. Thompson, M.D. the same day, and confirmed the abnormality was only the right zygomatic arch fracture. Hicks was seen by dental staff on March 22, and a soft diet was ordered by Defendant Sharon Pearson, D.D.S.

Hicks was seen on March 27 by oral surgeon Weathers, who reviewed the latest x-rays, found them unremarkable, noted an improvement in Hicks' jaw opening, and Hicks' statement that he was under stress and had been clenching his teeth. Flexeril was continued, and Weathers planned a follow up in four weeks.

Over the ensuing month, Hicks wrote several grievances, alleging that the medical staff was unresponsive to his condition and threatening suit. Aside from regular visits with medical staff, he was seen by Defendant Uecker on April 22, Psychiatrist Mel Limia, M.D. on April 30, and Defendant

Cline on May 3. Dr. Uecker referred Hicks to Dr. Weathers.[3] Dr. Cline ordered another facial x-ray to rule out displacement of the zygomatic arch fracture, which showed no change. Dr. Weathers saw Hicks on May 8, reviewed the x-rays ordered by Dr. Cline, and confirmed the fracture was not displaced. Four sets of x-rays were done to evaluate and monitor Hicks' condition to make sure it was properly healing and remained in proper alignment.

Hicks continued to complain of pain and seek prescription painkillers intermittently throughout May, and was seen by Dr. Uecker on May 24. Dr. Uecker continued Midrin, Flexeril and Motrin, 800 mg, for thirty days. Approximately three weeks later, or as these orders were about to expire, Hicks again began to complain of pain and insisted he had a broken jaw, which is unsupported by the records. He was seen on numerous occasions by medical staff, who found no swelling and no acute distress.

On June 20, he was seen by Dr. Davis on complaints of pain and for renewal of medications. Dr. Davis examined Hicks, found him in no distress, and referred him to the clinic as needed.

He continued to complain of pain and seek narcotic medications throughout July, he was seen by medical staff, and medications were renewed by Dr. Davis on July 22. Although the records do not indicate complaints by Hicks in August, he was seen regularly, and additional x-rays were ordered on August 16, and which were read as negative on August 21.

On November 2, 1996, Hicks was sent to oral and maxillofacial surgeons Charles B. Russo DMD, and Jeffrey Elliot, DMD, whose offices are in Coral Springs.[4] Drs. Russo and Elliot have no

---

[3] Contrary to the assertions in the Complaint, the record is clear Dr. Uecker did not recommend surgery on this date.

[4] The records of Drs. Russo and Elliot are identified in the Affidavit of Jeffrey Elliot, which is attached as Exhibit "B" to the Motion for Summary Judgment.

affiliation with the Defendants. A CT scan was performed on November 27, with the following findings:

> 33 y/o male presents with CC: persistent pain in his "TMJ." Patient was in his usual state of health when he allegedly was involved in an interpersonal violence on 02/07/96. He was evaluated by "some M.D.'s" and told that he had fractures. These fractures were allegedly not treated.
>
> Examination - Alert and oriented x 3. Cranial nerves II-VII grossly intact. Positive paresthesia right infraorbital nerve. No other facial paresthesia noted. Interincisal opening 38 mm, with slight deviation to the right. No clicking, popping, crepitus noted in either right or left TMJs. Left and right lateral excursions were unrestricted to 10 mm. Protrusive was noted to be 8 mm. <u>The mandible is grossly intact without stepping, segmental mobility or tenderness</u>. No gross entrapment of right coronoid process. No pain on loading TMJs. No pain on palpation of TMJs. Maxilla is non-mobile. Positive stepping with some tenderness right lateral wall of maxilla (maxillary sinus). Stepping noted right zygomatic arch. Infraorbital rims are continuous without tenderness. Patient is partially edentulous without gross dental pathology
>
> Radiographs: CT exam is remarkable for small break in the right posterolateral wall of the maxillary sinus. There is no fluid accumulation or gross thickening of either the right or left sinus membranes. The condyles appear normal. <u>A panoramic radiograph also suggests no old or new fractures of the mandible</u>.
>
> Impression: 33 y/o male S/P trauma with residual defect maxillary sinus. <u>There is no evidence of TMJ pathology at this time</u>. Patient's limited opening and complaint of discomfort may be due to scar tissue from original injury. Nonsurgical physical therapy may help.

[Emphasis added].

Hicks was not seen again until July 1997, and his records indicate he spent the intervening period in the Florida State Hospital. Over the remaining year of his detention, Hicks' complaints were largely limited to psychiatric problems and continued demands for narcotic medications. Pertinent to this discussion, his diagnoses included drug seeking behavior, manipulative behavior, delusions, and paranoia regarding mistreatment during his earlier Broward detention and his stay at

the Florida State Hospital.[5] His only significant medical complaint concerned an alleged broken nose suffered in the February 1996 altercation. This complaint was not confirmed on an October 7, 1997 x-ray.

The Defendants have retained Steven M. Holmes, D.D.S. as their oral and maxillofacial surgery expert.[6] According to Dr. Holmes, Hicks was appropriately treated for a nondisplaced right zygomatic arch fracture, which requires no intervention, and there is no evidence that Hicks suffered a fractured jaw. The time for disclosing experts has passed, and Hicks did not make the required disclosure.[7]

### C. The Motion for Summary Judgment and the Report

The Defendants filed their Motion for Summary Judgment [D.E. 226], making three primary arguments: (1) that Hicks received treatment demands entry of summary judgment; (2) that the complete lack of evidence that Hicks suffered an undiagnosed jaw fracture precludes this case going to trial; and (3) that the failure to show a policy or procedure causing a constitutional violation requires entry of judgment in favor of EMSA Limited Partnership.

The Report recommends denial of the Motion for four reasons. First, that record evidence supports the existence of zygomatic arch and maxilla fractures that were untreated. Second, that Dr. Uecker recommended oral surgery some four months after the incident, and the delay may constitute

---

[5] These records also include statements by Hicks that the State Attorneys who prosecuted him would soon be going to jail. The undersigned has learned that Hicks filed a complaint with the Florida Bar against those attorneys.

[6] A copy of Dr. Holmes' Notarized Report is attached as Exhibit "C" to the Motion for Summary Judgment.

[7] A copy of Hicks' Response to the Defendants' Expert Interrogatories is attached as Exhibit "D" to the Motion for Summary Judgment.

8

deliberate indifference. Third, that statements Hicks attributes to Dr. Cline, in which he purportedly stated that surgery would not occur because of cost, can be interpreted to establish a policy or procedure sufficient to bring liability to EMSA Limited Partnership. Finally, the Report uses affidavits executed by Hicks' current fellow inmates regarding continuing physical problems is sufficient to show that Hicks has current problems which can be diagnosed by a lay person.

For the reasons that follow, the Report should not be adopted.

## II.  Argument

As thoroughly briefed in the Motion, Hicks' sole claim, that his constitutional rights were violated by his lack of treatment while detained in the Broward County Jail, requires an elaborate showing to survive summary judgment. To make this showing, the record must include evidence of deliberate indifference, which itself requires two additional minima: that the plaintiff suffered a serious medical need, and the defendants intentionally refused to treat that need.

To show a serious medical need, a plaintiff must point to evidence he had a medical condition that was either diagnosed by a physician, or that treatment by a medical professional would be obvious to a lay person. The failure to diagnose a medical condition is not constitutionally actionable unless the record contains evidence that diagnosis would be obvious to a lay person. To show intentional refusal, a plaintiff must show either that no treatment was provided for the condition, or that the treatment provided was so ineffective as to be no treatment at all. With all respect, the Report mistakes the factual status of this record and confuses the legal standard to be applied to these cases.

### A.  Facts

The Report bases denial of summary judgment on two essential facts: that Hicks suffered a fractured zygomatic arch or maxillary sinus and that Dr. Uecker ordered surgery. The first is not an issue, and the second is incorrect.

That Hicks suffered a fracture of the zygomatic arch or maxillary sinus is not an issue. As shown by the medical record, Hicks did suffer these injuries as a result of the fight with another inmate. The record also shows that Hicks received extraordinary care from the Defendants for these ailments. Not only was Hicks treated by medical professionals and physicians multiple times per week over a period of more than a year, he was treated by jail specialists and dentists, and even outside, independent specialists. He was provided medications, x-rays, a CT scan and a panoramic radiograph, which showed the fracture was not displaced. Nothing more is required from a constitutional perspective.

However, Hicks did not suffer the ailment upon which he sues: a broken jaw, and the record is replete with evidence of this non-injury. Numerous x-rays taken in the jail and a CT scan performed by independent physicians fail to support this claim. In fact, the record is without support that Hicks suffered a broken jaw, or that any physician recommended that his jaw be wired.

Additionally, Dr. Uecker <u>did not</u> order surgery–he ordered oral surgery <u>consultations</u>. Dr. Uecker was a dentist, and as such could not order surgery. While the Report makes much of a four month delay in having Hicks evaluated by an oral surgeon, there was no such delay. Dr. Uecker first referred Hicks for an oral surgery consult in February, and Hicks was seen days later by Defendant Weathers, who <u>is</u> an oral surgeon and who saw Hicks on a regular basis over a period of months. In fact, Dr. Weathers examined Hicks on February 21, March 27 and May 8, and in each instance found no injury for which surgery was necessary. It was only after these consultations, and after Hicks continued to disbelieve Dr. Weathers' determination, that Hicks was sent to outside specialists. Their findings were exactly those of the Defendants: that Hicks received proper treatment in the jail, and he did not require surgery.

The Report makes much of a note authored by Barbara Evans, an employee of the Broward

Sheriff's Office, not a healthcare provider in the jail. In her note, Ms. Evans states that she reviewed the record, and that Dr. Uecker ordered surgery on April 22, 1996. Review of the record shows that Ms. Evans was wrong, and the Magistrate carries this mistake into the Report.

Finally, the Report virtually ignores the opinion of oral surgeon Stephen Holmes, D.D.S., who is the only expert in this case. Dr. Holmes reviewed nearly 1100 pages of medical records of care rendered to Hicks. Upon that review, it is his opinion that Hicks received care, not only commensurate with constitutional norms, but within the standard of care, which is a higher standard. Additionally, and most important, Dr. Holmes states that there is no treatment for non-displaced fractures such as those suffered by Hicks. Instead, these fractures are only treated in the event they become displaced. The record is clear that Hicks was regularly evaluated for possible displacement of the fractures, and displacement did not occur. Lacking this, no treatment, including surgery, was suggested or warranted.

### B. Law

#### 1. The Individual Defendants

Besides including several factual errors, the Report also misapplies the relevant law in several critical respects. First, it appears the Magistrate misunderstood the differing standards between a civil rights claim based on medical treatment and a medical negligence claim.

The Magistrate concludes that summary judgment should be denied the individual Defendants because issues of fact remain regarding whether other treatment was more appropriate, and whether earlier referral to an oral surgeon should have occurred. This conclusion, while appropriate in a medical negligence context, is an inappropriate reason to deny summary judgment in a medical civil rights claim because it ignores the heightened showing that must be made in these cases.

Because the Constitution is neither a vehicle for bringing medical malpractice claims nor a

substitute for state tort law, not every lapse in prison medical care rises to the level of a constitutional violation. *See Estelle*, 429 U.S. at 105-06. In *Estelle*, the Supreme Court explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses only the deliberate failure to treat "a prisoner's serious illness or injury" resulting in the infliction of unnecessary pain and suffering. *Estelle*, 429 U.S. at 105. "Because society does not expect that prisoners will have unqualified access to health care," a prisoner must make the threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Similarly, a prisoner must demonstrate more than "an inadvertent failure to provide adequate medical care" by prison officials to successfully establish constitutional liability. See *Estelle*, 429 U.S. at 105-06 (noting that mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim and emphasizing that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Once a medical defendant shows that treatment was provided, summary judgment is usually warranted. *See Estelle* 429 U.S. at 106 (stating that when a "medical provider provides treatment, even carelessly or ineffectively, to a prisoner, he has not displayed deliberate indifference to the prisoner's needs, but only negligence, which is not a constitutional violation"); *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)(upholding summary judgment where medical records showed treatment, and stating that "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment").

Here, the Report concludes that a question of fact exists regarding the efficacy of the treatment provided Hicks. This is an incorrect application of established precedent. The question is not one of efficacy, but of the intentional denial of medical treatment. As is clear from precedent, once

BUNNELL  WOULFE,  KIRSCHBAUM,  KELLER,  McINTYRE  &  GREGOIRE    P.A.    PO DRAWER 030340  FORT LAUDERDALE  FL 33303-0340  954·761·8600

treatment is provided, a plaintiff must show that treatment was merely cursory. Hicks' records from the Broward County Jail number more than 800 pages, and it is clear that he was provided treatment for his injuries. There can be no question that treatment was cursory, as he was treated by nearly every medical professional in the jail and was seen by outside consultants. Given this, entry of summary judgment in favor of the Defendants is required.

A final reason supporting summary judgment to the individual Defendants, the Report fails to point out specific acts leading to possible liability to any individual with the possible exception of Dr. Cline. Dr. Uecker is mentioned repeatedly, but only to note that his order for surgery, which is an erroneous reading of the record, was not carried out in a timely manner. Since there does not seem to be any basis upon which to premise liability to these Defendants, summary judgment should be granted.

## 2.   EMSA Limited Partnership

As argued in the summary judgment motion, EMSA Limited Partnership can only be liable for money damages on a section 1983 claim only upon a record showing of "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,'" or "'for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making body.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978); *Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir. 1988) (en banc), vacated on other grounds, 489 U.S. 1002 (1989) (holding that private defendants in section 1983 actions should have, at minimum, the same defenses available to public defendants); *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406 (2d Cir 1990). "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the

plaintiff's injury." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403, (1997).

Here, the Magistrate recommends denial of the summary judgment motion because Hicks claims that Dr. Cline allegedly told him that surgery would not be performed because of its high cost, and that this statement is sufficient to show evidence of custom or policy. This too is an incorrect application of existing law.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, there must be a showing of knowledge of such customs attributed to the governing body of the state agency or private entity. *See Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986).

If a policy or custom is shown, corporate liability may not be imposed under section 1983 unless the enforcement of that policy or custom was the moving force of a violation of federally protected rights. *See Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). That is, the Plaintiff must establish evidence of a "direct causal link" between the policy and the constitutional violation such that it actually caused the violation. *City of Canton v. Harris*, 489 U.S. 378, 385-87 (1989). However, it is well-settled that neither a municipality nor a private corporation may be held liable for violations brought pursuant to section 1983 on the basis of *respondeat superior*. *See Monell* at 690; *Jones v. Preuit & Mauldin*, 851 F.2d 1321, 1325 (11th Cir. 1988) (en banc), vacated on other grounds, 489 U.S. 1002 (1989).

From the foregoing, Hicks must make one of two showings to escape summary judgment. The first possibility is that he show a custom or policy by EMSA Limited Partnership that caused a

constitutional violation. This has not been shown, and the Report makes no mention that Hicks even attempted to make this showing.

The second possibility, and what the Report does use as a basis for potential liability, is a policy created by a person with sufficient decision-making authority for the law to attribute that person's decision to the private entity. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (stating that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered").

However, nothing in this record supports the assumption that Dr. Cline was a decisionmaker as required by *Pembaur*. There is no evidence that EMSA Limited Partnership granted Dr. Cline unfettered discretion to act on its behalf or that he held a position of such stature as to bind that entity. There can be no question but that it is Hicks' burden to prove Dr. Cline's authority to survive summary judgment, or that the record contains no such evidence. As such, EMSA Limited Partnership is entitled to entry of summary judgment in its favor as a matter of law. *See Doe v. Lebbos*, 348 F.3d 820, 831 (C.A.9 (Cal.) 2003)(affirming summary judgment on the grounds there was no showing an individual had sufficient decisionmaking authority).

### III. Conclusion

For the foregoing reasons, the Report of the Magistrate Judge should not be adopted, and summary judgment should be entered in favor of the Defendants.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was mailed this 2nd day of July, 2004 to Williams M. Hicks, *pro se Plaintiff*, #664670, Lake Correctional Institution, 19225 US Highway 27, Clermont, Florida 34711-9025.

>BUNNELL, WOULFE, KIRSCHBAUM,
>KELLER, McINTYRE & GREGOIRE, P.A.
>Attorneys for Defendants
>One Financial Plaza, # 900
>100 S.E. 3rd Avenue
>Ft. Lauderdale, FL 33394
>Tel: 954-761-8600
>Fax: 954-463-6643
>
>BY: _____
>RICHARD T. WOULFE
>Florida Bar No.: 222313
>GREGG A. TOOMEY
>Florida Bar No.: 159689

Richard T. Woulfe, Esquire/Gregg A. Toomey, Esquire/Attorneys for Defendants EMSA, Uecker, Cline, Davis, Weathers, G. Pearson and S. Pearson/Facsimile: 954-463-6643
William H. Hicks, *pro se Plaintiff*/Facsimile not available

16